UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DOUGLAS SAPIR,<br><br>Plaintiff and Defendant-in-Counterclaims<br><br>v.<br><br>JOBIAK, LLC; VENKAT JANAPAREDDY; NITIN AWTE; MANISH MEHTA; and RAMANA PAGADALA,<br><br>Defendants and Plaintiff-in-Counterclaims (with respect to Jobiak, LLC) | Civil Action No. 1:26-cv-12351-JEK |

**ANSWER AND COUNTERCLAIMS**

NOW COME Jobiak, LLC ("Jobiak"), Venkat Janapareddy, Nitin Awte, Manish Mehta, and Ramana Pagadala (collectively, the "Jobiak Parties"), by and through their undersigned counsel, and answer the Complaint of plaintiff Douglas Sapir ("Sapir") and assert affirmative defenses. Further, Jobiak asserts counterclaims against Sapir.

## I. ANSWERS

1. The Jobiak Parties deny that any wages or commissions are owed to Sapir, they deny that Sapir was misclassified, and they deny the remaining allegations of this paragraph of the Complaint.

2. The Jobiak Parties deny that Sapir is entitled to any of the damages or relief he seeks.

3. The allegations in this paragraph of the Complaint are legal conclusions to which no response is required. To the extent an answer is required, the Jobiak Parties admit that none of them are domiciliary of New Jersey and otherwise deny the allegations.

4. The allegations in this paragraph of the Complaint are legal conclusions for which no response is required. To the extent an answer is required, the Jobiak Parties deny the allegations because no events have given rise to Sapir's allegations and he is not entitled to any damages or other relief.

5. The Jobiak Parties deny this as they do not know where Sapir resides.

6. Admitted that Jobiak is a Delaware limited liability company. Denied to the extent that Sapir attempts to mischaracterize the terms of the Consulting Agreement dated September 17, 2024 between Jobiak and Sapir (hereinafter, the "Consulting Agreement"). The Consulting Agreement speaks for itself. If a further answer is required, the allegations are denied.

7. Admitted that Janapareddy is the CEO of Jobiak. Otherwise, denied.

8. Denied.

9. Denied, except that Manish Mehta is Jobiak's Head of Product & Special Initiatives.

10. Admitted that Ramana Pagadala signed the Consulting Agreement and served as Operations Head of Jobiak. Otherwise denied.

11. Denied.

12. Admitted that on or about September 17, 2024, Jobiak issued the Consulting Agreement to Sapir.

13. The Consulting Agreement speaks for itself and thus no answer is required. If an answer is required, the allegations are denied.

14. The Consulting Agreement speaks for itself and thus no answer is required. If an answer is required, the allegations are denied.

15. The Consulting Agreement speaks for itself and thus no answer is required. If an answer is required, the allegations are denied.

16. Admitted that Sapir countersigned the Consulting Agreement. Otherwise denied.

17. Denied.

18. The Consulting Agreement speaks for itself and thus no answer is required. If an answer is required, the allegations are denied.

19. Denied. Sapir was requested to participate in sales meetings but he often did not participate.

20. Admitted that HubSpot CRM was used by Jobiak, and that Sapir was expected to use it too. Otherwise denied.

21. Denied.

22. Denied.

23. Admitted insofar as Sapir was expected to make clear to Jobiak what work he was doing. Otherwise, denied.

24. Denied.

25. Admitted insofar as a new commission structure was proposed to Sapir, otherwise denied.

26. Denied.

27. Denied.

28. Admitted that Jobiak discussed with Sapir the possibility of Sapir receiving some equity in Jobiak under certain circumstances but those discussions were never finalized. Otherwise denied.

29. Denied.

30. Denied as there was no offer to purchase and no proposed investment.

31. Denied as there was no offer to purchase, no proposed investment, and no coercion.

32. The document speaks for itself and thus no answer is required. If an answer is required, the allegations are denied.

33. Denied.

34. The document speaks for itself and thus no answer is required. If an answer is required, the allegations are denied.

35. The document speaks for itself and thus no answer is required. If an answer is required, the allegations are denied.

36. The document speaks for itself and thus no answer is required. If an answer is required, the allegations are denied.

37. Denied.

38. Admitted that on October 30, 2025, Jobiak concluded Sapir's Consulting Agreement, via email. Otherwise denied.

39. Denied.

40. The document speaks for itself and thus no answer is required, assuming that Sapir is quoting an email. Otherwise denied.

41. The document speaks for itself and thus no answer is required, assuming that Sapir is quoting an email. Otherwise denied.

42. Denied.

43. Denied.

44. This paragraph of the Complaint does not appear to call for a response. If a

response is required, the Jobiak Parties deny the allegations.

45. This paragraph of the Complaint does not appear to call for a response. If a response is required, the Jobiak Parties deny the allegations.

46. Admitted that the Consulting Agreement states the contractual terms, otherwise denied.

47. Denied.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

52. Denied.

53. This paragraph of the Complaint does not appear to call for a response. If a response is required, the Jobiak Parties deny the allegations.

54. This paragraph of the Complaint does not appear to call for a response. If a response is required, the Jobiak Parties deny the allegations.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

59. This paragraph of the Complaint does not appear to call for a response. If a response is required, the Jobiak Parties deny the allegations.

60. Admitted that the Consulting Agreement states contractual terms, otherwise denied.

61. Denied.

62. Denied.

63. Denied.

64. This paragraph of the Complaint does not appear to call for a response. If a response is required, the Jobiak Parties deny the allegations.

65. Denied.

66. Denied.

67. Denied.

68. This paragraph of the Complaint does not appear to call for a response. If a response is required, the Jobiak Parties deny the allegations.

69. Denied.

70. This paragraph of the Complaint does not appear to call for a response. If a response is required, the Jobiak Parties deny the allegations.

71. This paragraph of the Complaint does not appear to call for a response. If a response is required, the Jobiak Parties deny the allegations.

72. Denied.

73. Denied.

74. Denied.

75. This paragraph of the Complaint is confusing and vague. If a response is required, the Jobiak Parties deny the allegations.

76. Denied.

77. Denied.

78. Denied.

79. Denied that Sapir is entitled to any damages or other relief.

## II. AFFIRMATIVE DEFENSES

Without assuming any burden of proof they would not otherwise bear, and reserving the right to assert additional defenses as discovery proceeds, the Jobiak Parties assert the following affirmative defenses:

1. Sapir's claim under the Massachusetts Uniform Securities Act's civil liability provision, G.L. c. 110A, § 410, fails because no security was sold or purchased and thus the elements of a claim under that statute are not satisfied. To state a claim under G.L. c. 110A, § 410, a private plaintiff must have actually purchased the security. A mere offer—which is all Sapir alleges—is not enough. Id.; see also Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 54-55 (2004) ("…the Act limits the buyer's remedy to recission (returning buyer to status quo))."

2. Sapir's claims fail because he was an independent contractor, not an employee, within the meaning of M.G.L. c. 149, § 148B and the applicable standards and tests and thus he does not state a claim for unpaid wages. Further, Sapir was paid more than he was owed in compensation under the Consultant Agreement and thus has no damages.

3. Any recovery by Sapir must be reduced or eliminated by setoff and recoupment, including for commissions Jobiak paid to Sapir that were not due under the Consultant Agreement and for the damages Jobiak sustained as a result of Sapir's breaches and unlawful conduct, as set forth in the Counterclaims below.

4. Sapir's claims are barred, in whole or in part, by his own prior and material breaches of the Consultant Agreement and the Proprietary Information and Invention Assignment Agreement incorporated therein, as set forth in the Counterclaims below.

5. Sapir's equitable claims, including those for unjust enrichment, *quantum meruit*, and declaratory relief, are barred by the doctrine of unclean hands, including Sapir's misappropriation of Jobiak's confidential information and property and his unauthorized access to Jobiak's electronic files after the conclusion of his engagement.

6. Regarding the claims against Venkat Janapareddy, Nitin Awte, Manish Mehta, and Ramana Pagadala, they fail because they were not Sapir's employer, they were not parties to the Consultant Agreement in their individual capacities, and they are not personally liable for the acts alleged.

7. Sapir claims a jury trial in this action, but Sapir waived a jury trial in the Consulting Agreement. See id., p. 2. He is therefore not entitled to a jury trial in this case.

8. The Jobiak Parties assert that Sapir did not effectuate service of process on each of them.

## III. COUNTERCLAIMS

1. Jobiak brings counterclaims against Sapir as set forth below.

2. Jobiak is a Delaware Limited Liability Company.

3. Upon information and belief, Sapir was, at all times relevant hereto, a domiciliary of New Jersey. Complaint [Doc. #1], par. 5.

4. This Court has subject matter jurisdiction over these counterclaims under 28 U.S.C. § 1332(a)(1) because the parties are citizens of different States and the amount in controversy exceeds $75,000, and under 28 U.S.C. § 1367 because the counterclaims form part of the same case or controversy as the claims asserted in the Complaint.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial

District, and the Consulting Agreement provides that venue is proper in state and federal courts sitting in Massachusetts. Exhibit 1, appended.

**A. Sapir Sought to Consult for Jobiak on an Independent Contractor Basis and Bring It New Clientele.**

6. Jobiak is a business-to-business recruitment marketing technology company.

7. Jobiak's web-based platform enables employers to publish and optimize job postings for Google for Jobs, which is the specialized search channel through which a substantial percentage of candidates begin their job search.

8. Jobiak's product addresses a specific technical problem, which is as follows. Google for Jobs will only index and rank a job posting that conforms to a defined structured-data specification. However, most employers and applicant-tracking systems do not produce postings in that form. Jobiak's platform takes in and analyzes an employer's job data, converts it into a compliant structured markup, validates it against Google's indexing requirements, and applies Jobiak's own search-optimization methodology and proprietary techniques to improve ranking within the channel.

9. Jobiak contracts out most of its business development and sales services.

10. Sapir informed Jobiak that he was experienced as a salesperson and wanted to offer his services on an independent contractor basis to generate new business for Jobiak.

11. Accordingly, Sapir was engaged by Jobiak on an independent contractor basis by letter dated September 17, 2024 (defined above as the Consulting Agreement). See Exhibit 1.

**B. Sapir Was Substantially Overpaid During The Course of His Work and Should be Disgorged of the Sums He Was Paid.**

12. Pursuant to the Consulting Agreement, Sapir was to be paid a flat fee of $75,000 per year plus a commission, as follows: "Commission: 20% of all net revenue (after deducting

any agency commissions, platform fees, third party fees, etc where ever applicable) which you bring on board." Exhibit 1, Consulting Agreement, p. 1.

13. Sapir received payments from Jobiak pursuant to the Consulting Agreement from October 16, 2024 through October 31, 2025. The total amount of his payments in 2024 and 2025 was approximately $149,710.08.

14. Sapir was compensated far in excess of what he should have been paid. This is evidenced in three ways.

15. First, Sapir was compensated a monthly flat fee of $6,250. He was paid this flat fee every month from October 16, 2024 through October 31, 2025. However, Sapir did very little work, and this did not meet Jobiak's expectations.

16. In particular, from April, 2025 through October 31, 2025 Sapir did almost no work and provided little or no visibility as to the efforts he was making. During September and October, 2025, Sapir had little or no contact with Jobiak but still demanded his payments, which Jobiak made.

17. Due to Sapir's failure and refusal to do work as contemplated under the Consulting Agreement, on or about October 30, 2025, Jobiak terminated the Consulting Agreement.

18. Jobiak's intention in paying Sapir a monthly fee was to compensate him for his work which was expected to be bringing new business to Jobiak. Because Sapir did not do any substantial or meaningful work during that six-month period, he breached his contract and should not have received a monthly fee. He was thus overpaid by approximately $37,500 (i.e., $6,250 per month for 6 months).

19. Second, the intention of the Consulting Agreement was for Sapir to be

compensated a commission for new business he brought in, like most commission-based sales contractors. This is reflected in the language of the Consulting Agreement, which provides commissions based on revenue he is able to "bring on board". Id.

20. However, Jobiak's business records show that approximately 90% of the job openings Sapir claimed to have introduced were not new opportunities at all. Rather, at the time of Sapir's alleged introductions, Jobiak was already posting or otherwise serving the same underlying employer job openings through its existing business partners and job-aggregation channels.

21. Thus, Sapir did not originate much new job inventory, introduce new employers, or create incremental revenue-producing opportunities for Jobiak. Instead, generally, he merely identified duplicative listings for the same employers and positions through different aggregators. Accordingly, any revenue associated with those pre-existing openings was not attributable to Sapir's efforts and cannot properly support a claim for commissions based on revenue he allegedly "brought on board."

22. Despite anemic sales, the total commission he received from Jobiak was $71,436 plus the fixed amount of $6,250 per month pursuant to the contract.

23. Due to the high-paced and fluid nature of the business model, and the large volume of job postings, it took a substantial amount of time for Jobiak to recognize what Sapir was doing. The arithmetic did not work at any volume: the cost to Jobiak of the arrangement with Sapir exceeded the value it created, and the more duplicative jobs Sapir introduced to Jobiak the larger the loss became. When Jobiak recognized this it informed Sapir that he would no longer be able to receive 20% for preexisting business.

24. Third, Sapir engaged in a whole-scale misappropriation and corporate theft of

Jobiak's confidential information and data that he then secretly used for personal and competitive purposes, as set forth in the section below. This misappropriation was diametrically against Jobiak's interests and diametrically in violation of multiple explicit and implied clauses in the several contracts between the parties, and in violation of statute.

25. Sapir started to steal and misappropriate Jobiak's confidential and proprietary corporate documents and data almost from the inception of his engagement. As soon as Sapir started to steal corporate documents he ceased to be providing good and valuable services to Jobiak, he ceased working pursuant to the Consulting Agreement, and he immediately forfeited any rights to be paid by Jobiak.

26. Of course, Jobiak had no idea that Sapir was stealing and misappropriating corporate documents and data. If it had known, it would have terminated all relationships immediately. Jobiak continued to pay Sapir until October 31, 2025. Jobiak seeks reimbursement of all amounts it paid to Sapir commencing when Sapir started to steal corporate documents, which was no later than October 10, 2024.

### C. Sapir Stole Confidential Data and Information from Jobiak Throughout the Term of the Relationship, He Gave Such Data and Information to his Brother, Daniel J. Sapir, and Sapir Used It To Compete With Jobiak.

27. At the inception of his work with Jobiak, Sapir signed Jobiak's Proprietary Information Inventions Assignment Agreement ("PIIAA"), which was incorporated into the Consulting Agreement. See Exhibit 1 (Consulting Agreement which appends the PIIAA); Exhibit 2 (the PIIAA itself).

28. The PIIAA is a robust and comprehensive agreement that provides, in essence, that Sapir would not misappropriate Jobiak's confidential information or data. In relevant part, it provides:

> **Company Information**. Consultant shall at all times during the term of Consultant's relationship with the Company and thereafter, hold in strictest confidence, and not use, except for the benefit of the Company, or disclose to any person, firm or corporation without written authorization of the Company's Managers, any Confidential Information of the Company. As used herein, "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom Consultant has called or with whom he or she became acquainted during the term of Consultant's relationship), markets, software, developments, inventions, conceptions, patentable subject matter, processes, formulas, technology, specifications, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information of the Company; provided, however that "Confidential Information" shall not include information which is not unique to the Company or which is generally known in the industry or the public. "Confidential Information" also does not include any of the foregoing items which has become publicly known and made generally available through no wrongful act of Consultant or of others who were under confidentiality obligations as to the item or items involved.

Id., par. 4(a).

> During the term of Consultant's relationship with the Company, Consultant shall not engage in any activity (whether compensated or not) that is competitive with the Company or hold any ownership interests or make any loan to any person or entity engaged in a business that is competitive to the Company.

Id., par. 6(a).

> Returning Company Documents. At the time of termination of the relationship between Consultant and the Company, Consultant covenants that he or she shall deliver to the Company (and will not keep in Consultant's possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by Consultant pursuant to Consultant's relationship with the Company or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to Section 5(c), except that Consultant may retain personal notes, notebooks, and similar items that do not contain any Confidential Information. In the event of the

> termination of Consultant's relationship with the Company, Consultant hereby covenants to sign and deliver the "Termination Certification" attached hereto as Exhibit B.

Id., par. 7.

> **Equitable Relief**. Because Consultant's services are personal and unique and because Consultant may have access to and become acquainted with the Confidential Information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

Id., par. 10.

29. Sapir also signed a certification that he would preserve as confidential all confidential information of Jobiak:

> In compliance with the Proprietary Information and Invention Assignment Agreement, I will preserve as confidential all Confidential Information (as that term is defined in the Proprietary Information and Invention Assignment Agreement) of the Company.

Id., Exhibit B.

30. Wholly unbeknownst to Jobiak, Sapir engaged in misappropriation of confidential corporate data and proprietary information during the period he was ostensibly working with Jobiak, as set forth below.

### i. First Misappropriation – Sapir Sent Two of Jobiak's Confidential PowerPoints to his Brother, Daniel Sapir

31. On October 10, 2024 at 11:56 p.m., which was shortly after his engagement started, Sapir emailed to his brother, Daniel J. Sapir, a proprietary Jobiak PowerPoint presentation called "Jobiak Agency Presentation". The "Jobiak Agency Presentation" is a proprietary document which contains confidential business information and data. Sapir told his brother in the cover email: "I'm obvi not done. Still editing some of what's already there and

adding new slides/info". Sapir used his Jobiak email address to send that file to his brother. See Exhibit 3 (correspondence between Sapir and Daniel Sapir on October 10-11, 2024.

32. Eight minutes later, on October 11, 2024 at 12:04 a.m., Daniel J. Sapir emailed Sapir saying: "I mean the original". Id.

33. Four minutes later, on October 11, 2024 at 12:08 a.m., Sapir emailed his brother another confidential Jobiak document, this time a PDF entitled "Jobiak Presentation". The "Jobiak Presentation" is also a proprietary document which contains confidential business information and data. In his cover email, Sapir said: "Oh right I forgot when I send you things they disintegrate after a certain timeframe. attached". Id.

34. Both the "Jobiak Agency Presentation" and the "Jobiak Presentation" are company-owned presentation material for clients. The presentations contain confidential and proprietary information relating to Jobiak's unique solutions, products, offerings, methodologies, and business approaches including pricing, which is customized. These documents are ordinarily shared with prospective clients only in the context of confidential business discussions.

35. Sapir sent these two documents from his Jobiak email account (doug@jobiak.ai) to his brother's personal email account (daniel.j.sapir@gmail.com). Exhibit 3.

**ii. Second Misappropriation – Sapir Misappropriated Jobiak's Confidential "Click Data" File.**

36. On or about April 11, 2025 at 10:24 p.m., Sapir forwarded confidential corporate data and proprietary information of Jobiak, to wit: a Microsoft Excel file titled "Whatjobs click data March 24-26.xlsx", to his personal email account (douglas.sapir@gmail.com). Exhibit 4.

37. That Microsoft Excel file is proprietary, confidential and valuable. It contains the data concerning performance for one of Jobiak's key business partners. That data compares Jobiak's success performance on jobs compared to the success the business parter was having

prior to Jobiak's participation. The data in that file is essential for Jobiak to measure and maximize its performance across jobs titles, locations, pricing, and time.

38. The information in that file reflects Jobiak's proprietary knowledge and data about what works across different job categories, locations and pricing levels, and it informs how Jobiak optimizes its business solutions and services.

39. The data and insights in that file help determine how Jobiak plans for the future, prices its services, posts its clients' jobs, and optimizes those jobs for success. It is a key business document for Jobiak and it would be valuable to any person in the same business space who misappropriated it.

40. There is no legitimate business reason why Sapir would need to provide access to this document from his Jobiak account to his personal email account. This was of course not authorized by Jobiak, Jobiak did not know that Sapir was doing this, and Sapir did this for his own ulterior purposes and not for the purposes of Jobiak under the Consulting Agreement.

41. Sapir did not need to transfer that file from his Jobiak account to his gmail account in order to use it for legitimate Jobiak purposes. Sapir misappropriated that document for only one purpose: to use it. He certainly did not steal that file to not use it.

**iii. Third Misappropriation – Post-Termination, Sapir Gained Unauthorized Access to Jobiak's Electronic Files and Misappropriated Three File Archives Through Google Takeout.**

42. As set forth above, due to Sapir's failure and refusal to do work as contemplated under the Consulting Agreement, on October 30, 2025, Jobiak terminated the Consulting Agreement.

43. Shortly thereafter, Sapir attempted to log into the Jobiak system but his access had been turned off. Exhibit 5 (matrix of post-termination activity by Sapir).

44. Forty-seven seconds after the failure, Sapir achieved access to the Jobiak system through a Google's account recovery flow, using his knowledge of a historical password.

45. Within the next 26 seconds, Sapir changed his account password and his account recovery email.

46. That same night, Sapir engaged in three "Google Takeout" archives in sequence, each within one second of a fresh login. Two spanned roughly sixty-five Google services including Gmail and Drive; the third was directed specifically at Gmail. The Gmail archive completed at 14:05:00 ET — five hours and twenty-one minutes after Sapir received the termination notice. Exhibit 5; see also Exhibit 6; Exhibit 7.

47. After Sapir did the takeout through Google, he deleted all of the emails relating to the takeout in order to obfuscate his document misappropriation. Exhibit 8.

48. Such conduct was of course not authorized by Jobiak, Jobiak did not know that Sapir was doing this, and Sapir did this for his own ulterior purposes and not for the purposes of Jobiak under the Consulting Agreement.

49. Sapir downloaded to his personal Google drive a substantial amount of data from the Jobiak computers. Sapir took and misappropriated the business documents set forth in Exhibit 10, which is Sapir's Google Takeout Activity.

### D. Post-Departure Misuse of Confidential Information

50. As set forth above, Sapir engaged in a wholescale theft of Jobiak's confidential and proprietary documents. After leaving Jobiak, Sapir has been competing with Jobiak using Jobiak's own documents and information, as set forth below.

#### i. Misuse #1 - Postal Job Connect

51. After leaving Jobiak, Sapir established an entity called "Postal Job Connect".

52. Sapir established Postal Job Connect as a way to assist candidates who are seeking jobs with the United States Postal Service.

53. Upon information and belief, Postal Job Connect competes with Jobiak and was established through a misuse of Jobiak's proprietary technology and intellectual property.

54. Sapir established the Postal Job Connect website (www.PostalJobConnect.com) by using one of Jobiak's channel partner's business model and marketing messaging. When this was discovered, that partner issued a cease and desist notice to Sapir and Postal Job Connect.

55. Any business generated by Sapir through Postal Job Connect was done through misuse of Jobiak's confidential business information and such profits should be disgorged.

**ii. Misuse #2 - Career Prep Advisors LLC**

56. Shortly after departing Jobiak, on December 22, 2025, Sapir established a competing venture, called "Career Prep Advisors LLC", which continues to operate in the recruitment marketing sector. Sapir is the Registered Agent and the sole principal of the company.

57. According to Sapir's LinkedIn profile page, after leaving Jobiak he has engaged in a very similar business model:

> Building stuff. Trying to make job search suck less.
>
> …
>
> Built and launched two paid jobseeker platforms end to end using AI development tools, Lovable, Supabase, API integrations, and workflow automation. I currently own the frontend, backend, data infrastructure, payments, analytics, customer experience, and internal dashboards. Grew the products to 500+ paying users and $20K/month in revenue within three months. I also own the full growth motion, including paid advertising, conversion optimization, attribution, pricing, and partner economics. Closed four traffic partnerships and continue using live performance and margin

> data to optimize campaigns and scale the most profitable acquisition channels.

Exhibit 9 (Sapir's LinkedIn profile).

**iii. Possible Misuse #3 - Interview Army**

58. Prior to starting his engagement with Jobiak, Sapir founded a business called Interview Army LLC ("Interview Army").

59. Interview Army engaged in business that was directly competitive with Jobiak, as they are both in the business space of helping employers with high-volume hiring, streamlining hiring, and reducing recruitment costs for employers. See PIIAA, Exhibit A. Sapir described Interview Army as follows:

> A recruitment advertising agency specializing in helping employers with high-volume hiring of delivery drivers, warehouse associates, call center reps, retail workers, and other high-volume roles. Developed a process involving direct phone conversations with candidates to ensure qualification and fit before application, streamlining hiring, and reducing recruitment costs for employers. As part of Interview Army's services, the Interview Army Newsletter provides jobseekers with tips, tools, advice, and hot job listings to help them get interviews, secure promotions, transition jobs, and negotiate raises, offering practical insights and resources to support career growth.

Id.

60. Upon information and belief (to be adduced further through discovery), Sapir misused Jobiak's confidential documents, know-how and data by utilizing same to unfairly compete with Jobiak, possibly through Interview Army or a different entity.

61. Jobiak has been substantially harmed by all of the foregoing conduct of Sapir, and demands compensation therefore.

**COUNT I**
**BREACH OF CONTRACT – THE CONSULTING AGREEMENT**

62. Jobiak repeats and realleges the allegations in the preceding paragraphs as if set

forth herein in full.

63. The Consulting Agreement, dated September 17, 2024, is a valid and binding contract between Jobiak and Sapir.

64. Jobiak performed its obligations under the Consulting Agreement, including by paying Sapir the monthly flat fee and commissions.

65. Sapir materially breached the Consulting Agreement, including by:

i. Failing and refusing to perform the business-development and sales services for which he was engaged;

ii. Performing little or no work from approximately April, 2025 through October 31, 2025;

iii. Collecting commissions on preexisting business that he did not "bring on board" within the meaning of the Consulting Agreement;

iv. Misappropriating Jobiak's confidential documents and data during the term, thereby ceasing to render the good and valuable services the Consulting Agreement required; and

v. Violating the PIIAA, including but not limited to Paragraphs 4(a), 6(a) and 7, and Exhibit B thereto. As set forth in the Consulting Agreement, a violation of the PIIAA is a violation of the Consulting Agreement.

66. Most of the business that Sapir presented to Jobiak was business that Jobiak already had, and thus it was not new business. Sapir was merely displacing existing partner relationships and job openings that Jobiak was already serving. This substitution caused reduced partner confidence, diminished goodwill, and a loss of ability to grow and leverage established commercial relationships over time.

67. As a direct and proximate result of Sapir's breaches, Jobiak has been damaged and seeks compensation therefor.

**COUNT II**
**BREACH OF CONTRACT – THE PIIAA**

68. Jobiak repeats and realleges the allegations in the preceding paragraphs as if set forth herein in full.

69. The PIIAA, which Sapir signed at the inception of his engagement and which was incorporated into the Consulting Agreement, is a valid and binding contract between Jobiak and Sapir.

70. Jobiak performed its obligations under the PIIAA.

71. Sapir violated the PIIAA by stealing and misappropriating confidential Jobiak records and data and by competing with Jobiak using such confidential Jobiak records and data.

72. Sapir materially breached the PIIAA, including by: (a) failing to hold Jobiak's Confidential Information in strictest confidence and using and disclosing it other than for Jobiak's benefit in violation of Paragraph 4(a); (b) engaging in activity competitive with Jobiak, in violation of Paragraph 6(a); and (c) failing, upon termination, to deliver to Jobiak — and instead taking, retaining, recreating, and transmitting to others — Jobiak's records, data, and documents, in violation of Paragraph 7, and (d) failing to comply with the Termination Certification (see Exhibit 2, subexhibit B).

73. Sapir's conduct was in breach of Paragraphs 4(a), 6(a) and 7 of the PIIAA, and Exhibit B thereto.

74. As a direct and proximate result of Sapir's breaches, Jobiak has been damaged, including through the payment of a monthly flat fee of approximately $37,500 for a period in which Sapir performed no substantial work, the payment of approximately $71,436 in commissions, most of which were not earned, the profits lost by Jobiak, the unjust enrichment by Sapir and his competing business, and other consequential damages, together with interest. As a

direct and proximate result of Sapir's breaches, Jobiak has been damaged and faces continuing and irreparable harm, entitling Jobiak to damages and to the injunctive and equitable relief for which the PIIAA expressly provides in Paragraph 10.

**COUNT III**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**
**18 U.S.C. § 1030**

75. Jobiak repeats and realleges the allegations in the preceding paragraphs as if set forth herein in full.

76. Jobiak's computer systems and the Google-hosted environment on which Jobiak's data resided are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2), used in and affecting interstate commerce.

77. On October 30, 2025, Jobiak terminated Sapir's engagement and disabled his authorization to access Jobiak's systems, as Sapir discovered when his attempted login failed.

78. Sapir thereafter intentionally accessed Jobiak's protected electronic data without authorization, in violation of 18 U.S.C. § 1030(a)(2) and (a)(4). After his access had been disabled, he circumvented the revocation by exploiting a historical password through a Google account-recovery flow, changed the account password and the recovery email to entrench his access, obtained Jobiak's information, and generated three "Google Takeout" archives spanning Gmail, Drive, and approximately sixty-five services.

79. Sapir acted knowingly and with intent to defraud, obtained information and things of value, and caused damage — including by deleting emails relating to the takeout to conceal his conduct — impairing the integrity and availability of Jobiak's data.

80. Sapir's conduct caused Jobiak loss aggregating at least $5,000 in value during a one-year period in response and damage-assessment costs, including the costs of responding to

the intrusion, conducting a damage assessment, and investigating the unauthorized access.

81. The conduct of Sapir was not mere misuse of files, folders or databases that he had access to, but rather he exceeded authorized access by reaching files, folders or databases that were off limits to him.

82. Pursuant to 18 U.S.C. § 1030(g), Jobiak is entitled to compensatory damages and injunctive and other equitable relief.

**COUNT IV**
**MISAPPROPRIATION OF TRADE SECRETS, DEFEND TRADE SECRETS ACT**
**18 U.S.C. § 1836**

83. Jobiak repeats and realleges the allegations in the preceding paragraphs as if set forth herein in full.

84. Jobiak's confidential information — including the compiled performance and "click data" concerning a key business partner, and Jobiak's proprietary methodologies, optimization techniques, and customized pricing reflected in its presentations — constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) related to products and services used in interstate commerce.

85. This information derives independent economic value from not being generally known or readily ascertainable by proper means, and Jobiak took reasonable measures to keep it secret, including through the confidentiality obligations of the PIIAA and its access controls.

86. Sapir misappropriated Jobiak's trade secrets, acquiring, disclosing, and using them by improper means and in breach of the confidentiality duties he owed Jobiak, including by transmitting them to his brother and his personal accounts and by using them to compete with Jobiak.

87. Jobiak is entitled to injunctive relief, compensatory damages for actual loss and

unjust enrichment, exemplary damages for willful and malicious misappropriation, and attorneys' fees under 18 U.S.C. § 1836(b)(3).

**COUNT V**
**MISAPPROPRIATION OF TRADE SECRETS, MASSACHUSETTS UNIFORM TRADE SECRETS ACT**
**M.G.L. C. 93, §§ 42–42G**

88. Jobiak repeats and realleges the allegations in the preceding paragraphs as if set forth herein in full.

89. The confidential information described above constitutes trade secrets within the meaning of G.L. c. 93, § 42, including Jobiak's compiled business and customer data, business strategy, methodologies, and pricing.

90. Jobiak took efforts reasonable under the circumstances to protect the secrecy of that information, and the information provided Jobiak an economic advantage from not being generally known or readily ascertainable by proper means.

91. Sapir misappropriated that information by improper means, including breach of the confidential relationship and duties he owed Jobiak, and disclosed and used it without Jobiak's consent.

92. Jobiak is entitled to injunctive relief under G.L. c. 93, § 42A, damages under § 42B including exemplary damages for willful and malicious misappropriation, and attorneys' fees and costs under § 42C.

**COUNT VI**
**UNJUST ENRICHMENT**

93. Jobiak repeats and realleges the allegations in the preceding paragraphs as if set forth herein in full.

94. This Count is pleaded in the alternative to Counts I and II, in the event any

contract is found not to govern or be enforceable in this action.

95. Jobiak conferred a measurable benefit on Sapir by paying him approximately $149,710.08 in flat fees and commissions.

96. Sapir appreciated and knowingly accepted that benefit, understanding that the payments were made in exchange for business-development services and revenue he was expected to bring on board.

97. Under the circumstances — in which Sapir performed little or no work during substantial periods and simultaneously misappropriated Jobiak's confidential information — Sapir's retention of those payments would be inequitable without restitution to Jobiak. Jobiak demands compensation therefore in an amount to be determined by the Court.

**COUNT VII**
**CONVERSION**

98. Jobiak repeats and realleges the allegations in the preceding paragraphs as if set forth herein in full.

99. Jobiak owned and had a possessory interest in its proprietary documents and data, including the "Jobiak Agency Presentation," the "Jobiak Presentation," the "Whatjobs click data March 24-26.xlsx" file, and the file archives Sapir extracted through Google Takeout.

100. Sapir intentionally and wrongfully exercised dominion and control over that property by copying it, transmitting it to his brother and to his personal email accounts, downloading it to his personal Google Drive, and retaining it after termination, and — to the extent he legitimately obtained possession of any of it — by refusing to return or destroy it upon Jobiak's demand.

101. As a direct and proximate result, Jobiak has been damaged and demands compensation therefore in an amount to be determined by the Court.

## COUNT VIII
## VIOLATION OF G.L. c. 93A §11

102. Jobiak repeats and realleges the allegations in the preceding paragraphs as if set forth herein in full.

103. Jobiak and Sapir were both engaged in trade or commerce, and their dealings arose in a business context.

104. Sapir committed unfair and deceptive acts and practices in the conduct of trade or commerce by misappropriating Jobiak's proprietary materials and confidential information and then using those materials in the marketplace to compete with Jobiak, including through Postal Job Connect and Career Prep Advisors LLC, and by concealing his conduct.

105. Sapir committed unfair and deceptive acts and practices in the conduct of trade or commerce by demanding and accepting monies to which he knew or should have known he was not entitled.

106. Most of Sapir's unfair and deceptive business conduct occurred in Massachusetts.

107. Sapir's acts were willful and knowing, entitling Jobiak to multiple damages and to attorneys' fees and costs under G.L. c. 93A, § 11, in addition to its actual damages.

## PRAYER FOR RELIEF

WHEREFORE, The Jobiak Parties respectfully request that the Court:

1. Grant judgment for the Jobiak Parties on the Complaint filed by Sapir;

2. Enter judgment in favor of Jobiak on its counterclaims against Sapir;

3. Award Jobiak damages, restitution, and disgorgement in an amount to be determined at trial, including the amount of the commissions overpaid to Sapir and all other damages caused by Sapir's conduct, together with pre- and post-judgment interest;

4. Order Sapir to return to Jobiak all confidential information, documents, data, and property belonging to Jobiak, and to destroy all copies in his possession, custody, or control;

5. Enter preliminary and permanent injunctive relief, and such other equitable relief as is appropriate under Section 10 of the PIIAA, restraining Sapir from using or disclosing Jobiak's Confidential Information and requiring compliance with his obligations under the PIIAA;

6. Award Jobiak its costs, legal fees, interest and double or triple damages; and

7. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

JOBIAK, LLC; VENKAT JANAPAREDDY; NITIN AWTE; MANISH MEHTA; and RAMANA PAGADALA,

By their attorneys,

Jonathan D. Plaut
BBO #638344
COHAN PLAUT RAJSICH LLP
50 Milk Street, 16th Floor
Boston, MA 02109
Tel: (617) 451-3200
E-mail: jdplaut@CRMLLP.com

Dated: September 15, 2026

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of this document via filing on the electronic pacer system and by electronic mail to all parties or their counsel.

Jonathan D. Plaut
Date: September 15, 2026